**BURLINGTON NORTHERN RAILROAD COMPANY, Petitioner,**

v.

**SURFACE TRANSPORTATION BOARD and the United States of America, Respondents.**

**West Texas Utilities Company, Intervenor.**

No. 94–1622.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 1995.

Decided Feb. 9, 1996.

Samuel M. Sipe, Jr., with whom John D. Graubert, Washington, DC and Michael E. Roper, Fort Worth, TX, were on the briefs, argued the cause for petitioner.

Henri F. Rush, General Counsel, Surface Transportation Board, with whom Craig M. Keats, Associate General Counsel, and Judith A. Albert, Attorney, Surface Transportation Board, and Anne K. Bingaman, Assistant Attorney General, John J. Powers, III, and John P. Fonte, Attorneys, United States Department of Justice, Washington, DC, were on the brief, argued the cause for respondents.

Kelvin J. Dowd, Frank J. Pergolizzi, and Andrew B. Kolesar, III were on the brief for intervenor West Texas Utilities Company. Donald G. Avery and William L. Slover, Washington, DC, entered appearances.

Before: BUCKLEY, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Petitioner Burlington Northern transports coal from the Powder River Basin in Wyoming to the Oklaunion generating station in Texas for a coal-burning electric utility, West Texas Utilities Company ("WTU"), an intervenor in these proceedings. WTU's coal moved under contract with Burlington from 1986, when the Oklaunion generating station began operating, until 1995, when the contract between the parties expired. Contract transport is an alternative to traditional common carrier rail transport; once the responsible agency—currently the Surface Transportation Board, which replaced the Interstate Commerce Commission under the recently-enacted ICC Termination Act of 1995 ("Termination Act"), Pub.L. No. 104–88, 109 Stat. 803, and previously the Commission itself—has passed on a contract, transportation proceeds under its terms, free from agency oversight. See 49 U.S.C. §§ 10701a, 10702 (1995), amended by Termination Act § 102(a), 109 Stat. at 809–10 (to be codified at 49 U.S.C. §§ 10701, 10702) (requiring rail carriers to establish rates and providing for agency oversight of reasonableness of rates); id. § 10713(c), (h) & (i)(1), amended by Termination Act § 102(a), 109 Stat. at 817–18 (to be codified at 49 U.S.C. § 10709(b), (c)(1) & (g)) (stating terms of agency review of contracts and exempting contract transport from general agency oversight). The present case poses a question at the cusp of the contract and common carrier forms of service: Where all parties assumed that Burlington would provide common carrier service if it and WTU proved unable to agree on a contract to replace their existing agreement, could the Commission, more than a year before contract service was expected to end, order the carrier to file a tariff for common carrier service?

Burlington's contract with WTU was set to expire on December 31, 1996, or, in the event of certain contingencies not specified in the record, as early as late 1995.[1] The parties

1. The Burlington–WTU contract itself is not part of the record and is described by Burlington as "confidential." Brief for Petitioner at 3; see also 49 U.S.C. § 10713(b)(1) (1995) (requiring rail carriers providing contract transport to file with the Commission any contract entered into, "together with a summary of the contract containing such nonconfidential information as the

informed us after oral argument that the contract in fact expired in the fall of 1995, at which time service began on a common carrier basis. More than a year earlier, however, WTU filed a complaint asking the Commission to order Burlington to publish a "just and reasonable" rate for future common carrier transport on the route. The Commission did so in August 1994, telling Burlington to file a tariff by September 23, 1994. *West Texas Utilities Co.,* Docket No. 41191 (served Aug. 24, 1994) (the "August Decision"). Burlington sought a stay, which the Commission granted pending its own decision on the matter, and then denied in a decision served October 14, 1994 (the "October Decision"). Burlington filed the required tariff following the October Decision, and the Commission began a proceeding to review whether the proposed rate was just and reasonable. Burlington now seeks review of the Commission's August Decision. Because the Surface Transportation Board has succeeded the Commission as the regulatory authority responsible for oversight of rail carriers, the Board, not the Commission, is the respondent here. See Termination Act § 204(c)(1), 109 Stat. at 942.

The threshold issue before us is whether either the expiration of the Burlington–WTU contract or the passage of the Termination Act moots the case. We conclude that neither event has this effect. We also reject the Board's and WTU's argument that the tariff filing order is not subject to review because it is not a final order or, alternatively, is not ripe for review. On the merits, the Board and WTU argue that the order should be upheld as an exercise of the Commission's authority under former 49 U.S.C. § 10762 to require a common carrier to file a tariff for rates on service it "may provide." 49 U.S.C. § 10762(a)(1) (1995), *repealed by* Termination Act § 102(a), 109 Stat. at 804–52. We dis-

agree and therefore reverse the Commission's decision.

## I. Mootness

 Article III confines federal courts to the resolution of actual cases or controversies, and thus prevents their passing on moot questions—ones where intervening events make it impossible to grant the prevailing party effective relief. *Church of Scientology v. United States,* 506 U.S. 9, 11, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992). Either the expiration of the Burlington–WTU contract or adoption of the Termination Act might have that effect. The expiration of the contract might do so because, as Burlington concedes, it placed Burlington under an immediate and ongoing obligation to provide service to WTU on a common carrier basis, so that invalidation of the disputed tariff might not improve Burlington's position in any way.[2] The Termination Act might thwart effective relief for either of two reasons. First, it abolishes the tariff filing requirement contained in former 49 U.S.C. § 10762, under which the Commission issued the disputed order. See Termination Act § 102(a), 109 Stat. at 804–52; August Decision at 1 n. 5; but see 49 U.S.C. § 10702(a) (1995), *amended by* Termination Act § 102(a), 109 Stat. at 810 (to be codified at 49 U.S.C. § 10702(1)) (continuing separate requirement that a rail carrier subject to the jurisdiction of the Board "establish ... rates ... for transportation and service it may provide"). Second, the Termination Act provides that "[a]ll orders ... that have been issued ... by the Interstate Commerce Commission ... *in the performance of any function that is transferred by this Act* ... shall continue in effect according to their terms...." Termination Act § 204(a), 109 Stat. at 941 (emphasis added). If, as seems possible, the disputed order was not entered into "in the performance of" a function re-

---

Commission prescribes"), *amended by* Termination Act § 102(a), 109 Stat. at 817 (to be codified at 49 U.S.C. § 10709(d)(1)) (limiting filing requirement to contracts for transport of agricultural products); 49 CFR §§ 1313.7, 1313.10–13 (1995) (prescribing information to be contained in contract summary required by former § 10713(b)(1)).

**2.** The Termination Act does not alter the common carrier status of rail carriers such as Burlington. See Termination Act § 102(a), 109 Stat. at 807–08 (to be codified at 49 U.S.C. § 10501) (defining the jurisdiction of the Board); *id.,* 109 Stat. at 830–31 (to be codified at 49 U.S.C. § 11101) (specifying common carrier obligations of rail carriers subject to Board's jurisdiction).

tained by the Act (in light of the Act's abolition of the tariff filing requirement), then the order will not "continue in effect" under the Act. In this circumstance, our invalidation of the compulsory tariff would not afford Burlington any relief not already granted by the Act itself.[3]

We need not decide the impact of these events on our ability to grant meaningful relief, however, because the situation before us falls into the category of cases "capable of repetition, yet evading review," and hence independently satisfies Article III's case-or-controversy requirement. See *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); see also *Doe v. Sullivan,* 938 F.2d 1370, 1376–79 (D.C.Cir.1991). On first glance, the proposition that the situation is "capable of repetition" might appear dubious in light of the Termination Act's abolition of the tariff filing requirement. In a letter filed with the court shortly after passage of the Act, however, the Board informed us that the agency's posture on its authority to order rail carriers to establish (though not file) rates for common carrier service was unchanged. According to the Board's letter, since carriers remain subject to general common carrier obligations under the Act, "the Board could require a railroad to quote a common carrier rate to a shipper that has requested such a rate quotation from the carrier," though the Board could not any longer require *filing* of the rate. Although a statement of the Board after a proceeding addressing the matter would be more authoritative than its general counsel's letter, we see no reason to doubt that counsel's statement represents the Board's position on the legal question at issue. Moreover, as noted above, although the Termination Act abolishes the tariff filing requirement, it preserves the old statute's requirement that rail carriers "establish" rates for service they "may provide"—pre-

cisely the words of former 49 U.S.C. § 10762 on which the Commission relied in promulgating the order under review here. See Termination Act § 102(a), 109 Stat. at 810 (to be codified at 49 U.S.C. § 10702); August Decision at 1 n. 5; October Decision at 5.[4] Accordingly, any future effort by the Board to compel a railroad to state a rate for common carrier service that was expected to follow the end of ongoing contract service would pose an interpretive issue substantially similar to the one Burlington has raised here.

And there is a "reasonable expectation" that Burlington will in the future be subject to such compulsion. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350. (1975). Burlington has coal transportation contracts with nearly 50 electric utilities, and the expiration of each contract carries the potential for a repeat of the WTU events. Indeed, it appears that Burlington has *already* been confronted with a utility customer's request for the relief obtained by WTU. In a post-argument brief, Burlington told us that the Commission had recently entertained a shipper's motion for an order directing the filing of a tariff in parallel circumstances. See *Western Resources, Inc.,* Docket No. 41604 (served Aug. 18, 1995); Supplemental Brief of Petitioner at 12 n. 5. The railroad involved was Atchison, Topeka, and Sante Fe Railway Company, which merged with Burlington in the fall of 1995 and thus is, legally, Burlington. Moreover, the Commission's (and, now, the Board's) insistence in this litigation on the value of having the authority to order tariff filing (and, now, establishment of rates) in this sort of situation obviously evidences the probability of such orders recurring in the future; normally (though not always, to be sure), a power is not terribly important to someone who does not plan to use it.

3. We express no opinion as to whether the disputed order was in fact entered into in the performance of a function retained by the Act. The function of overseeing the reasonableness of rail rates for common carrier service is one that is retained by the Act, see Termination Act § 102(a), 109 Stat. at 809–10 (to be codified at 49 U.S.C. § 10701), and the tariff filing order might be thought to have been entered into in the

performance of that function. See October Decision at 4 n. 8.

4. Indeed, in the October Decision the Commission cited explicitly to § 10702 as well as to former § 10762 in arguing its authority to compel tariff filing by Burlington. See October Decision at 1; *id.* at 4.

The agency action here would also evade review, because of the virtual certainty that contracts giving rise to such action will expire before the conclusion of judicial review of the action (ordering filing or establishment of rates). Indeed, the Board concedes this point, as it must in light of the cases: both Supreme Court and circuit precedent hold that orders of less than two years' duration ordinarily evade review. *Southern Pacific,* 219 U.S. at 514–16, 31 S.Ct. at 283–84; *In re Reporters Comm. for Freedom of the Press,* 773 F.2d 1325, 1329 (D.C.Cir.1985); see also *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 707 (1978) (duration of 18 months too short for full litigation). A Board order requiring a carrier to establish a rate for traffic that may begin moving in common carrier service in, say, a year, would generally not be susceptible of review prior to the commencement of service. Thus, regardless of any limits on affording Burlington effective relief from the August Decision, the situation confronting Burlington is capable of repetition yet evades review, and hence satisfies the case-or-controversy requirement.[5]

## II. Finality and Ripeness

"Final orders" of the Commission were made subject to review in the courts of appeals by 28 U.S.C. §§ 2321(a), 2342(5) (1995), *amended by* Termination Act § 305(c) & (d), 109 Stat. at 945 (substituting Board for Commission in jurisdictional provisions). The Board and WTU argue that the August Decision is not "final," and thus not subject to our jurisdiction, because the tariff filed by Burlington was simply the initial step in a proceeding to establish reasonable rates for the shipment of WTU's traffic after expiration of the contract. The Board and WTU also argue that even if the order is final, it is unripe. We disagree on both counts.

### A. *Finality.*

■ An administrative order is final when "rights or obligations have been determined or legal consequences will flow from the agency action." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970). The order must "impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process." *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948); see also *Mountain States Telephone & Telegraph Co. v. FCC,* 939 F.2d 1021, 1027 (D.C.Cir.1991) (same). The Board notes that "all agency orders fix rights and obligations in some way or other, and yet not all are final." Brief for Respondents at 12. True enough. Typically, for example, the rights and obligations flowing from an order to participate in a proceeding are not "the sorts of rights and obligations" that make an order final. *Aluminum Co. of America v. United States,* 790 F.2d 938, 941 (D.C.Cir. 1986); see also *FTC v. Standard Oil Co.,* 449 U.S. 232, 241–43, 101 S.Ct. 488, 493–95, 66 L.Ed.2d 416 (1980) (agency determination to commence proceedings is not final agency action); *Peter Kiewit Sons' Co. v. Army Corps of Engineers,* 714 F.2d 163, 168 (D.C.Cir.1983) (similar).

■ The compulsory tariff filing, however, had immediate effects on legal rights relating directly to the parties' primary conduct. Once filed, a tariff binds the filing party "with the force of law." *Lowden v. Simonds–Shields–Lonsdale Grain Co.,* 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939). Indeed, the parties agree that Burlington's tariff for the WTU traffic placed it under an immediate obligation to transport any traffic presented to it under the terms of

---

5. The parties do not dispute (based on representations in letters filed with the court) that the suit survives the passage of the Termination Act under the terms of the Act itself. We see no reason to question this conclusion. The Act provides that a suit is to continue if it "involves a function retained and transferred ... to the Board" under the Act. See Termination Act § 204(c)(2), 109

Stat. at 942. Given the Board's assertion of continuing authority to order establishment of rates for common carrier service well in advance of the commencement of such service, we think the Board could not seriously claim that the suit does not involve a function "retained and transferred" to it.

the tariff. See Tr. of Oral Argument at 4, 13.[6]

Perhaps the Board's and WTU's argument is that the compulsory filing (well in advance of the anticipated expiration date of the contract) had no immediate practical consequences for Burlington. See, e.g., Brief for Respondents at 12–13; Brief of Intervenor West Texas Utilities Co. at 17–18. This argument, however, is belied by the Commission's own analysis, in its October Decision, of the ramifications of not ordering a filing—an analysis that reveals how the compulsory filing affected Burlington, not because it obliged the railroad to participate in a proceeding, but rather because of the *timing* chosen by the Commission for the onset of that obligation. Explaining the importance of the compulsory filing to WTU, the Commission observed that "a reasonable degree of advance certainty regarding costs is imperative before a utility can design a rate structure, obtain regulatory approval for it, and implement it." October Decision at 9. Transportation costs represent a significant component of WTU's overall costs; thus, "[i]f [Burlington] were to publish tariff rates at the last moment and they were subsequently found unreasonable · in an investigation," WTU would be "forced to go through the same time-consuming procedures for designing and implementing a new electric rate structure...." *Id.* This prospect of "protracted and costly Federal and State regulatory proceedings following a last-minute [Burlington] tariff publication" might have "a chilling effect on its ability to negotiate a reasonable contract rate with [Burlington]." *Id.* at 9 n. 19. The Commission closed its analysis with an explicit statement of the likely effects on the negotiations between Burlington and WTU: "Essentially, the cumulative cost of a coal rate reasonableness proceeding sandwiched between electric rate proceedings and the payment of refunds *could force [WTU], as a practical matter, to accept a contract rate that could be at a*

*premium above what would otherwise be a maximum reasonable tariff rate." Id.* (emphasis added); see also WTU's Reply to Supplemental Memorandum, *West Texas Utilities Co.,* Docket No. 41191 (similar). The Commission itself thus explicitly recognized that the tariff filing order might have shifted the balance in the parties' negotiations over a new contract by altering the default situation—what would prevail were no agreement reached.

## B. *Ripeness.*

■■■■ The Board and WTU argue that if Burlington's claim is not moot, it is unripe. Cf. *Sullivan,* 938 F.2d at 1379 ("The government argues that Doe's challenge [to the use of experimental drugs on military personnel] is either too late or too early: moot because Operation Desert Storm is over; not ripe, because the next conflict is not yet upon us."). Paradoxical as the pairing of those arguments may be, ripeness is, of course, an independent requirement for judicial review—one that we find is satisfied here.

■■■■ Ripeness depends on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Burlington raises a purely legal question—whether the Commission had statutory authority to order the filing of a tariff in the absence of any expectation of imminent common carrier service—and such questions are typically found fit for judicial review. See *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515–16; *Mississippi Valley Gas Co. v. FERC,* 68 F.3d 503, 508 (D.C.Cir.1995). Furthermore, there is no suggestion that the Commission's policy, as reaffirmed by the Board in its recent letter to the court, has not "crystallized," or that there may be some other material institutional advantage from deferring review.

---

**6.** Abolition of the tariff filing requirement under the Termination Act means that a kindred order promulgated in the future would be an order to establish a rate, rather than an order to file a tariff. The quoted rate, unlike a filed rate, might lack "the force of law"—that is, might not impose an obligation on the carrier to transport traffic presented to it at the specified rate. However, the fact that a future order to establish a rate might not be a final order affects neither the finality of the order now before us nor the conclusion that the situation presented satisfies the "capable of repetition" requirement.

See *Eagle–Picher Ind. v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985).

The hardship to Burlington from the withholding of judicial review has plainly declined since expiration of its contract with WTU and the start of its common carrier service. But the reasons why the case is not moot define the residual hardship. Without review now, Burlington will be subjected to continued risk of similar agency action in the future. Particularly since without review Burlington faces the prospect of never securing any judicial remedy, these hardships are adequate to sustain judicial review.

### III. The Commission's Authority To Order Tariff Filing

■ Before turning to the heart of the question presented by Burlington's petition for review, we must first dispose of the suggestion by the Board and WTU that Burlington in essence agreed to the very order now disputed. The suggestion rests on Burlington's statement that it was willing "to publish a unit train tariff [suitable for WTU's traffic] which would be in place *if and when WTU's coal ceases to move under contract.*" Supplemental Memorandum in Support of Burlington Northern Railroad Company's Motion to Dismiss, *West Texas Utilities Co.,* Docket No. 41191 (emphasis added). But this is plainly not a general offer to file a tariff whenever the Commission pleased. Indeed, the Commission itself summarized the offer as a commitment to publish a unit train tariff "in sufficient time to avoid any rail service interruption." October Decision at 8.

■ This brings us directly to the question whether the Commission had statutory authority to impose upon a rail carrier a *current* obligation to file a tariff specifying a rate for traffic—such as WTU's as of the date of the August Decision—that would not be ready to move under the rate until months or years down the road. The Board asserts that the Commission enjoyed broad authority to investigate possible violations of statutory requirements and to "take appropriate action to compel compliance" with these requirements. 49 U.S.C. § 11701(a) (1995), *amended by* Termination Act § 102(a), 109 Stat. at 845 (to be codified at 49 U.S.C. § 11701(a)) (tying investigative authority to the filing of a complaint seeking investigation). But these powers appear ancillary; unless there was statutory authority elsewhere to *require* the tariff filing ordered by the Commission, general authority to see to it that carriers followed the statute's requirements is of no use. In fact, as noted above, the Commission rested its decision on former 49 U.S.C. § 10762, which provided that

> (a)(1) A carrier *providing* transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of [title 49] shall publish and file with the Commission tariffs containing the rates and (A) if a common carrier, classifications, rules, and practices related to those rates, ... established under this chapter for transportation or service it *may provide* under this subtitle.

*Id.* § 10762(a)(1) (emphasis added), *repealed by* Termination Act § 102(a), 109 Stat. at 804–52; but see *id.* § 10702(a), *amended by* Termination Act § 102(a), 109 Stat. at 810 (to be codified at 49 U.S.C. § 10702(1)) (requiring a rail carrier subject to the jurisdiction of the Board to "establish ... rates ... for transportation and service it may provide"). Whether the Commission's judgment may be upheld turns on whether its interpretation of former § 10762 was either mandated by the unambiguous meaning of the statute or permissible as one of several reasonable constructions of ambiguous statutory language. See *Chevron, Inc. v. NRDC,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). We conclude that the Commission's interpretation was not a permissible construction of former § 10762 and, thus, a fortiori, was not mandated by the language of the statute.

Although the opening words of former § 10762 limited its application to carriers "providing service," its final ones required a carrier to publish a tariff for transportation or service it "may provide," with no express temporal limitation. The Commission relied on the familiar argument that since such limitations were found elsewhere in the statute, "Congress knew how to impose a temporal constraint on the Commission's jurisdiction when it wanted to do so," and "[t]he fact

that it did not do so [here] strongly suggests that it did not intend to do so." October Decision at 4. The Commission went on to argue that because of the sharp time limits imposed by former 49 U.S.C. § 10707(b) on its power to suspend a newly filed rate, its expansive reading of former § 10762 was essential. See October Decision at 4–5.[7]

We read former § 10707 as having precisely the opposite effect: the sharp time limits imposed by the section indicate that the Commission had only very limited power to suspend carrier-chosen rates pending completion of a Commission proceeding. Former § 10707 began by authorizing the Commission to investigate newly filed rates and requiring that any Commission proceeding as to the rate's compliance with the statute be completed within five months—which the Commission could extend to eight months by reporting to Congress and explaining its delay. See 49 U.S.C. § 10707(a) & (b)(1) (1995), *repealed by* Termination Act § 102(a), 109 Stat. at 804–52. Former § 10707 then specified what would happen if the Commission failed to reach a final decision within the applicable time period: "[T]he rate ... (A) is effective at the end of that time period [allowed for the proceeding]; or (B) if already in effect at the end of that time period, remains in effect." *Id.* § 10707(b)(1), *repealed by* Termination Act § 102(a), 109 Stat. at 804–52. In effect, then, it was any *suspension* of the rate that was limited to five months (or, contingently, eight), as the Commission clearly understood. See October Decision at 4 (citing former § 10707(b) for proposition that its authority to suspend was limited to five months).

Former § 10707 not only limited the duration of suspension but also specified limited circumstances in which the Commission could suspend a rate at all:

(1) The Commission may not suspend a proposed rate ... unless it appears from the specific facts shown by the verified statement of a person that

 (A) it is substantially likely that the protestant will prevail on the merits;

 (B) without suspension, the proposed rate change will cause substantial injury to the protestant ...; and

 (C) because of the peculiar economic circumstances of the protestant, the provisions of subsection (d) of this section [providing for payment of reparations in the event of overpayment by a shipper] do not protect the protestant.

(2) The burden shall be on the protestant to prove the matters described in paragraph (1)....

49 U.S.C. § 10707(c) (1995), *repealed by* Termination Act § 102(a), 109 Stat. at 804–52.

Finally, the statutory constraints on suspension were framed by the rules governing the period between a carrier's filing of a rate and the rate's effective date. The carrier specified the rate's effective date in the first instance, subject to the requirement that the date be at least 20 days after publication in the case of "a proposed rate change resulting in an increased rate" and at least one day after publication in the case of a new rate or a rate reduction. See *id.* § 10762(c)(3) & (d)(1) (setting 20–day interval for rate increases and new rates and 10–day interval for rate reductions, and authorizing Commission to reduce statutory notice requirements by regulation), *repealed by* Termination Act § 102(a), 109 Stat. at 804–52; 49 CFR § 1314.5 (1995) (setting 20–day interval for rate increases and 1–day interval for new rates and rate reductions).[8]

Taken as a whole, then, the statutory scheme against which the Commission's action must be measured was one under which

---

**7.** The Termination Act does not include any analogue to former § 10707, nor does it provide any new form of authorization for suspension of newly established rates. As will become apparent in the discussion to follow, this change in the law suggests that any future action by the Board along the lines of the Commission's action here would be on even weaker statutory ground than was the action taken here.

**8.** The Termination Act provides that the Board "shall promptly rescind all regulations established by the Interstate Commerce Commission that are based on provisions of law repealed and not substantively reenacted by this Act." Termination Act § 204(a), 109 Stat. at 941. So far as appears, section 1314.5 has not yet been repealed, but we assume that repeal will occur shortly (if it has not already).

a rate could go into effect almost immediately and remain in effect unless and until a shipper established the narrow grounds for suspension—that the rate would cause "substantial injury" and that due to its "peculiar circumstances" the reparations provisions would supply inadequate protection. In other words, the Commission had extremely limited authority to compel rail carriers to serve at rates other than those of their own choosing before completion of a Commission proceeding assessing the rates. Viewed in this light, the Commission's August Decision was no more than an end-run around the statutory scheme—jump-starting the rate review process well in advance of the earliest possible date at which common carrier service could begin, and thereby avoiding the practical force of the statutory limits on its authority.

Indeed, the Commission was quite explicit that its purpose in ordering early filing by Burlington was to ensure that a Commission-approved rate would be on file by the earliest possible date at which Burlington's contract with WTU could expire:

> [Burlington's] approach ... would put the Commission and West Texas in an untenable position by disabling us from meaningfully exercising our jurisdiction at the appropriate time. It would mean that West Texas's only means of challenging a newly published tariff rate that it viewed as unreasonable would be through filing a protest seeking either an investigation or a suspension and investigation of the allegedly unlawful rate under [former] 49

U.S.C. [§§] 10701a [specifying standards for rail carriers' rates] and 10707.

October Decision at 4. The Commission found this remedy for WTU unacceptable because it might require WTU to pay an unreasonably high rate during the course of the Commission proceeding and only later receive reparations for its overpayment (with interest at a rate the Board does not claim is unrealistic). The Commission noted that WTU would risk substantial (temporary) overpayment whether or not the Commission suspended Burlington's rate. If the rate were not suspended, WTU would be required to pay it, and if it were suspended (an action that could only be taken, of course, if WTU met the statutory requirements), then the applicable rate would be a "single-car class rate" that Burlington had on file with the Commission—a rate that the Commission found would be "unsuitably high" for WTU's traffic. *Id.* at 5.[9] In any event, under either route, the fact that "coal rate investigations are measured in terms of years rather than weeks" meant that WTU would be required to pay the potentially excessive rate for an "extended time period," and, the Commission concluded, "[t]he uncertainty associated with an extended rate investigation would play havoc with the utility's ability in turn to set rates for its electric consumers." *Id.*[10]

We have no doubt that payment of an unreasonably high rate for some period of time could have worked hardship on WTU. But the short answer to the Commission's argument is that any hardship visited upon WTU would have followed directly from the

---

**9.** The Commission acknowledged the possibility of solving the excessive rate problem by prescribing an interim rate for Burlington's service. It concluded, however, that it lacked the authority, before conducting a full rate reasonableness proceeding, to prescribe a specific rate at which Burlington would be required to serve. See October Decision at 5 n. 10. While the Commission acknowledged that it could *notify* Burlington of the range of rates it would deem acceptable, see *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 652–53, 98 S.Ct. 2053, 2065–66, 56 L.Ed.2d 591 (1978), Burlington would be under no obligation to actually provide service at a rate within this range.

**10.** It is not obvious to us which (if any) provision of the statute explicitly entitled a shipper in WTU's position to collect reparations for earlier

overpayment. Former § 10707(d)(1) ordered reparations in the event of an unsuspended rate *increase* found to be unreasonable, and former § 10707(d)(2) allowed the carrier to collect refunds for a suspended rate later found to be in whole or in part reasonable. Former § 10707(d)(3) applied only to a rate *decrease* ultimately found to be reasonable. The Supreme Court upheld the Commission's authority to order refunds in connection with an initial rate in the case of an apparently similar statutory gap, see *Trans Alaska Pipeline Rate Cases*, 436 U.S. at 654–55, 98 S.Ct. at 2066–67, and presumably a similar result would have obtained here. In any event, the parties all assume that reparations would have been available for WTU in the event of its payment of a rate later found to be unreasonable.

balance of interests struck by the statute itself. Congress could have written former § 10707 to permit suspension for a much longer period than the five (or eight) months specified by sub-section (b) of that section, and for a much broader set of reasons than those specified by subsection (c). Such an arrangement would have reflected a different balance of carriers' and shippers' interests, one more favorable to shippers than the arrangement Congress actually chose. Instead it decided to allow carrier-chosen rates to go into effect before the Commission had the chance to pass on them, except where relatively narrow criteria for suspension were met, and even then only for a period that is relatively short in relation to the length of Commission rate proceedings (measured in years, as the Commission said). The congressional combination, assigning to the carrier great flexibility as to the effective date of its tariff filings, and to the Commission very limited suspension power, had the effect of assuring that for the most part carriers did not pay the price for lags in Commission rate proceedings. The Commission's proposed end-run would have destroyed that protection.

We recognize that the circumstances here were special. The happenstance of the somewhat archaic single-car rate on file with the Commission meant that the default rate in the event of suspension would have been relatively high; indeed, for *any initiation* of service the absence of a plausible default rate would tend to blunt the Commission's suspension remedy. There are two answers to this, however. First, the Commission's reading of "may provide" in former § 10762 was not inherently susceptible to being limited to initial service. If, for example, the Commission had found itself confronting circumstances where technological or other developments made a drop in the reasonable level of rates foreseeable, then (on its reading of former § 10762) it could have ordered a filing well in advance of when the drop in rates would actually occur, thus permitting it to steal a march on the carrier. Second, there was an obvious reason for Congress to have allowed a carrier comparatively greater de facto flexibility on initial service. Congress limited the Commission's rate-setting power

to cases where the carrier enjoyed "market dominance." See 49 U.S.C. § 10709(c) (1995), *amended by* Termination Act § 102(a), 109 Stat. at 816 (to be codified at 49 U.S.C. § 10707(c)) (making conforming amendments to statutory language). But for service so new that it involves construction of a new rail line, a carrier would be unlikely to have such dominance, as prospective shippers could negotiate with a range of potential carriers to provide the new transport, and thus could take advantage of competition among such carriers. But the statutory language point is in any event controlling: the Commission's reading of the statute would have permitted it to order advance filings in circumstances far less exigent than those present here.

We note WTU's argument that the Commission had the authority to initiate a rate reasonableness proceeding based on the existing single-car rate Burlington had on file with the Commission, as occurred in *San Antonio, Tex.*, 355 I.C.C. 405 (1976), *aff'd on other grounds sub nom. Burlington Northern, Inc. v. United States*, 555 F.2d 637 (8th Cir.1977). See also *Akron, Canton & Youngstown R.R. Co. v. ICC*, 611 F.2d 1162, 1165 (6th Cir.1979) (relying on unreasonableness of existing tariff terms to uphold carriage requirement for previously excluded traffic). As the Commission recognized, see October Decision at 6 & n. 13 (emphasizing that the Commission was *"not here reviewing the [single-car] class rate"*) (emphasis added); see also *id.* at 5 n. 11 (similar), any such approach would have raised questions under § 229 of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (reproduced as historical and statutory note to former 49 U.S.C. § 10701a (1995)), which provides limited grandfathering (as against reasonableness attacks) to all rates in effect on the effective date of the Staggers Act. As the Commission chose not to initiate review of the single-car rate, the issues such a device might have raised are not before us, and we cannot assume the validity of the alternative device as a basis for reasoning about what the Commission in fact chose to do.

\* \* \*

The Commission's August Decision surely "vindicate[d] [shippers'] rights," as the Board repeatedly suggests. E.g., Brief for Respondent at 10; see also *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 653, 98 S.Ct. 2053, 2066, 56 L.Ed.2d 591 (1978) (stating, in upholding Commission action, that the action was "an intelligent and practical exercise of [the Commission's] suspension power which is thoroughly in accord with Congress' goal ... to strike a fair balance between the needs of the public and the needs of regulated carriers"). The problem, however, is that the rights vindicated by the Commission's order are directly at odds with rights that were expressly established by the statute. Accordingly, the petition for review is

*Granted.*