In re G–I HOLDINGS, INC., Debtor.

**Official Committee of Asbestos Claimants, Appellant,**

v.

**Bank of New York, Appellee.**

Bankruptcy No. 01–30135(RG).
No. Civ. 03–4275(WGB).

United States District Court,
D. New Jersey.

Jan. 29, 2004.

Kenneth A. Rosen, Jeffrey D. Prol, Lowenstein Sandler P.C., Roseland, NJ, for Appellant.

William S. Katchen, Duane Morris LLP, Newark, NJ, for Appellee.

BASSLER, District Judge.

The Official Committee of Asbestos Claimants ("the Committee") appeals the June 18, 2003 decision of the Honorable Rosemary Gambardella, U.S.C.B.J. In that decision, the Bankruptcy Court held that it lacked subject matter jurisdiction to modify, in the way that the Committee had requested, a preliminary injunction that the Bankruptcy Court had previously issued. The Committee seeks to have this Court reverse the Bankruptcy Court's determination and remand the matter for a resolution on the merits of its motion to modify.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 158(a). The Court has carefully reviewed and considered all the parties' briefs, the Bankruptcy Court's June 18 Opinion, and any other pertinent items that were included in the record on appeal. The Court also heard oral argument on January 29, 2004. For the following reasons, the Court **affirms** the Bankruptcy Court's June 18, 2003 decision.

## I. *BACKGROUND*

### A. *The Parties*

On January 5, 2001 ("Petition Date"), G–I Holdings, Inc. ("G–I" or "the Debtor"), which is a holding company, filed a voluntary petition under Chapter 11 of Title 11, United States Code ("Bankruptcy Code").

G–I is currently operating its business as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. G–I is successor to GAF Corporation ("GAF"), an entity named in approximately 500,000 asbestos actions prior to merging into G–I. The Committee asserts that as successor to GAF, G–I remains liable for approximately 150,000 asbestos suits filed and unresolved as of the Petition Date and for unknown numbers of asbestos claims that will be filed in the future.

Building Materials of America, Inc. ("BMCA") is an indirect non-bankrupt subsidiary of G–I, and is also the primary operating subsidiary and principal asset of G–I. Created in 1994, BMCA received all the assets of GAF's roofing products business and expressly assumed $204 million of asbestos liability with G–I indemnifying BMCA against any additional asbestos liability. Notwithstanding that BMCA claims to have never manufactured any asbestos containing products, since September of 2000, it has been named as an additional defendant in more than 1,000 asbestos bodily injury lawsuits against GAF. These claims are based on theories of successor liability or alter ego.

The Committee is an official committee of creditors appointed on January 22, 2001, by the United States Trustee pursuant to 11 U.S.C. § 1102(a), to represent those individuals who allegedly suffer injuries related to the inhalation of asbestos from products manufactured by G–I's predecessors.

The Legal Representative is a fiduciary appointed by the Bankruptcy Court to represent persons who hold present and future asbestos-related demands against the Debtor. The Legal Representative fully supports this appeal brought by the Committee.

The Bank of New York ("BNY") is a financial institution that headed a consortium of lenders ("BNY Group") under revolving credit agreements designed to provide BMCA with access to funds for working capital for its business. Prior to December 2000, this revolving credit facility consisted of a $110 million unsecured line of credit. In December 2000, BNY, on behalf of the lender group, agreed to enter into a new $100 million credit facility over and above the existing $110 million credit facility with BMCA. Upon entering the new $100 million credit facility, BMCA gave the BNY Group a first priority lien on substantially all of its assets, thus securing the first credit facility as well as the second.

When the December 2000 credit extensions and new facility were entered, BMCA had outstanding $539 million in a number of series of publicly issued notes, for which BNY acted as indenture trustee. The holders of BMCA's publicly-issued notes ("Noteholders") received a second lien on BMCA's assets.

### B. *Preliminary Injunction*

On January 8, 2001, G–I commenced the present adversary proceeding against individuals who sued BMCA on asbestos related personal injury claims. At the outset, G–I sought, pursuant to 11 U.S.C. § 105(a)[1], a preliminary injunction barring the filing or prosecution of present and future asbestos claims against BMCA, pending confirmation of a plan of reorganization for G–I or the issuance of a declaratory judgment as to whether BMCA bears successor liability or alter ego liability for asbestos claims.[2] According to G–I, an injunction was necessary to protect the value of the estate, because BMCA would otherwise itself be forced into bankruptcy. Moreover, contending that all asbestos claims against BMCA are also essentially pending against G–I given its indemnification agreement, G–I argued that the Bankruptcy Court would lose its ability to fashion a uniform and efficient method of resolving asbestos claims if asbestos claimants were allowed to prosecute their claims in various courts throughout the country. BNY appeared and joined G–I's application for a preliminary injunction. The Committee intervened and opposed the requested relief, arguing among other things, that the Bankruptcy Court should not exercise jurisdiction over a non-debtor third party by extending the automatic stay to such third parties where the litigation would otherwise not affect property of the bankruptcy estate.

Following a hearing on June 8, 2001, in a decision read on the record on June 22,

1. The "All Writs" section of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

2. In February 2001, the Debtor and BMCA commenced an adversary proceeding in the Bankruptcy Court for a judgment declaring that BMCA was not liable as successor or alter ego for G–I's asbestos liabilities ("Successor Liability Action"). The Committee intervened as a defendant and counterclaimed for a judgment declaring that BMCA was liable under theories of successor liability and piercing the corporate veil. This Court withdrew the reference of the Successor Liability Action to the Bankruptcy Court; thus, that action is now pending before this Court.

Also in February 2001, the Committee commenced an adversary proceeding seeking to substantively consolidate the estate of G–I with BMCA on an interim basis in order to bring the BMCA liens within the 90 day preference period as measured from the Debtor's Petition Date. By Order dated April 6, 2001, the Bankruptcy Court denied the Committee's request. The substantive consolidation adversary proceeding has since been inactive pending the outcome of the Successor Liability Action.

201, the Bankruptcy Court held that it had subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and granted the preliminary injunction requested by G–I. After negotiations and additional hearings, a formal Preliminary Injunction Order ("PI Order") was entered by the Bankruptcy Court on February 22, 2002. The PI Order allows BMCA to continue to operate its business in the ordinary course as a non-debtor, but requires BMCA to make certain disclosures, and prohibits it from carrying out certain specified transactions without first giving the Committee thirty days notice. The transactions subject to this notice requirement included refinancing or replacement of BMCA's existing credit facility with BNY, as well as the making of any pre-payments on BMCA's outstanding public notes.

On July 19, 2001, the Bankruptcy Court clarified its intended scope for the PI Order by stating:

> It was never the intention of the Court in determining that conditions be drafted on the injunction to not allow BMCA, which is admittedly a non-debtor, notwithstanding the Debtor's success in obtaining a preliminary injunction, it was never the intent of this Court to not allow normal course transactions to proceed. It appears that the types of certain of the conditions that the Committee wished to have imposed, without agreement, go well beyond what this Court envisioned as reasonable conditions.... So if there has been some misapprehension to not have normal course transactions proceed in the normal course, I know of no authority that would have me impose conditions that

would not allow a non-debtor to do business.

Trans. of July 19, 2001 Hearing, at 64–65.

### C. *Refinancing*

On March 18, 2003, BMCA gave notice to the Committee of its intention to replace the BNY Group's credit facilities, which were scheduled to expire in August 2003, with a new facility ("Citibank Facility") by a group of new lenders led by Citibank ("Citibank Group"). The Citibank Facility offered to establish a secured revolving credit facility with a maximum credit limit of between $350 million and $375 million, which would refinance the existing $210 million credit facility provided by the BNY Group, approximately $35 million in notes, and other financial obligations. At the closing, the BNY Group's loans to BMCA would thus be repaid in full. The Citibank Facility would be secured by liens in virtually all BMCA's assets, replacing the liens granted to the BNY Group.

G–I, BMCA, the Committee, and the Legal Representative did not oppose or seek to prevent the refinancing, but did seek to condition the refinancing on certain specified conditions. Specifically, BMCA, the Committee, and the Legal Representative sought to modify the preliminary injunction to provide that BMCA's entry into the Citibank Facility and usage of the Facility would not prejudice the rights, if any, that the Committee, the Legal Representative, or the bankruptcy estates of G–I or BMCA (if and when BMCA becomes a debtor in bankruptcy) may have against the BNY Group or the Noteholders in, among other things, actions that the Committee might bring in the future against BMCA, including actions seeking to avoid the liens that BMCA had given to secure the BNY Credit Facility.[3]

---

**3.** BMCA, the Committee, and the Legal Representative submitted for the Bankruptcy

Court's approval a proposed order that provided in pertinent part:

As stated by the Committee, the rationale for the proposed modification was as follows: BNY and the Noteholders had enjoyed the benefit of the preliminary injunction for two years during which asbestos claimants had been restrained from prosecuting their claims against BMCA. These restraints prevented asbestos claimants from engaging in the "race of diligence" that generally determines priorities among creditors of nonbankrupts, such as BMCA. As G–I acknowledged when it moved the preliminary injunction, without the benefit of that order, BMCA would have soon followed G–I into Chapter 11. Had BMCA filed Chapter 11, its pre-petition debts could not have been repaid except pursuant to a plan of reorganization, and the liens held by the BNY Group and Noteholders would have been subject to immediate attack as preferential transfers. Thus, the opportunity for BNY to receive payment from BMCA, which is one result of the Citibank refinancing, would not have arisen without the preliminary injunction. Accordingly, the Committee asserts that "simple fairness" dictates that the BNY Group and Noteholders should not be permitted to improve their position in relation to asbestos claimants by setting up, on the basis of the new Citibank refinancing, new legal defenses that would not otherwise exist as to the avoidance of their liens.

While not objecting to the proposed refinancing, BNY challenged the Bankruptcy

Court's jurisdiction to prejudice or modify the rights and defenses arising from BMCA's payment of the amounts due BNY under the credit agreements. As argued by BNY, the signing of the proposed order would have deprived BNY in advance of its ability to assert payment of the amounts owing to it under the BNY Credit Facility as a defense in any unspecified future action by the Committee, including BNY's right to assert that such payments would moot (because the liens would no longer be in existence or necessary once payment was made) any attempt by the Committee to avoid the liens granted in December 2000 to secure payment of the amounts owing under the BNY Credit Facility.

In response, the Committee argued that the Bankruptcy Court possessed subject matter jurisdiction to modify its own injunction. Moreover, the Committee argued that the Bankruptcy Court should find that BNY was "judicially estopped from raising defenses to the anticipated avoidance power claims." (R. 1 at 24:7–25.) Alternatively, the Committee requested that the Bankruptcy Court determine to be without merit any defenses arising from payment to BNY out of the proceeds of the proposed Citibank Facility that BNY might assert in any hypothetical, future actions. Finally, the Committee asked the Bankruptcy Court to decline approval of the proposed Citibank refi-

---

BMCA's entry into the proposed Citibank Financing Facility and any usage of that facility shall not . . .
b. give rise to any rights or defenses in favor of the [BNY] Group that do not otherwise exist under the Credit Agreements or applicable law with respect to any cause of action or remedy that has been or may be asserted by the Committee, the Legal Representative or the estates of G–I or BMCA (including without limitation those actions and remedies referred to in clauses (I) through (iv) of paragraph 5 below).

(R. 5 at 5, ¶ 3.) The "actions and remedies" referred to are set forth in paragraph 5 of the Order and include "(iv) any future proceeding in which the Committee or the Legal Representative shall assert any cause of action or seek any remedy against the [BNY] Group or the Noteholders arising out of BMCA's granting of any liens, or payment of any monies, to the [BNY] Group or the Noteholders." (R. 5 at 7.)

nancing if it found that any of BNY's defenses had merit. (*Id.*)

After hearings on May 14 and May 23, 2003, the Bankruptcy Court held a final hearing on June 11, 2003 and reserved decision. The court later dictated its decision on the record at a hearing held on June 17, 2003. That decision is embodied in an Order filed June 18, 2003.

### D. *Decision Below by Bankruptcy Court*

The June 18, 2003 Order provides in pertinent part that the Committee and Legal Representative shall not object to the entry by BMCA into the Citibank Facility and that entry into the Citibank Facility and any usage thereof to pay BNY shall not prejudice the rights that the Committee, the Legal Representative, the estate of G–I or BMCA may have to pursue, including, among other things, avoidance claims against BNY or the Noteholders. Moreover, the Order provides that such entry into or usage of the Citibank Facility shall not "prejudice any rights or defenses of the [BNY] Group, Noteholders, or [BNY] in its capacity as indenture trustee with respect to any [such] causes of action . . ." (R. 6 at ¶ 3(b)).

In reaching that decision, the Bankruptcy Court held "that it lacked subject matter jurisdiction to modify the conditions to the Preliminary Injunction" to bar BNY or the Noteholders from asserting that the refinancing of BMCA's debt "gives rise to new rights or defenses in favor of the [BNY] Group or the Noteholders that do not otherwise exist under applicable loan documents or existing law." (*Id.* at 5.) In determining that the court lacked subject

matter jurisdiction, Judge Gambardella relied on two separate grounds.

First, the Bankruptcy Court held that the Committee's request for it to adjudicate, at that time, the Committee, Legal Representative, BNY, and Noteholders' future defenses or rights by or between each other was not ripe for judicial review given that the preference and avoidance actions that the Committee might assert would require intervening actions. (R. 1 at 19–25.) Therefore, Judge Gambardella intimated that she could not modify the preliminary injunction as requested by the Committee because doing so would be tantamount to assuming jurisdiction over a "possible or conjectural" controversy or rendering an "advisory opinion." (*Id.* at 19:20–25.)

Second, the Bankruptcy Court held that there was no subject matter jurisdiction under 28 U.S.C. § 1334(b). Specifically, the Bankruptcy Court rejected the Committee's assertion that the relief it sought "related to" G–I's bankruptcy case within the meaning of that jurisdictional statute.

Notwithstanding the Bankruptcy Court's determination that it had no subject matter jurisdiction, the Bankruptcy Court considered and rejected the Committee's argument on the merits that, based upon allegedly inconsistent statements by counsel in prior proceedings, BNY was "judicially estopped" from claiming that payment to it of the balance due under the BNY Credit Facility would give rise to defenses to future avoidance actions. In reaching that decision, Judge Gambardella concluded that BNY's position had not "substantially changed" from its prior position. (*Id.* at 19:3–6.)

The Committee now appeals the Bankruptcy Court's June 18, 2003 decision.[4]

---

**4.** The refinancing with the Citibank Group closed in July 2003. However, by a separate Order dated June 18, 2003, the Bankruptcy

Court granted the Committee affirmative interim relief pursuant to Rule 8005, Fed. R. Bankr.P., to preserve the status quo on the

## II. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a), "[t]he district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges." The Third Circuit has taken a pragmatic view of finality in bankruptcy cases. *See John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 157 (3d Cir.1993). A decision in a bankruptcy matter is final when " 'nothing remains for the [lower] court to do.' " *In re West Electronics Inc.*, 852 F.2d 79, 81 (3d Cir.1988) (quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101 (3d Cir.1981)).

██ A bankruptcy court's factual findings may be disturbed only if clearly erroneous. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1221 (3d Cir.1989). A factual finding is clearly erroneous if it is either "completely devoid of minimum evidentiary support displaying some hue of credibility or . . . bears no rational relationship to the supportive evidentiary data," *Krasnov v. Dinan*, 465 F.2d 1298, 1302–03 (3d Cir. 1972), or, even though there is some evidence to support it, if the reviewing court is left with the definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

██ Legal conclusions of the bankruptcy court, however, are subject to plenary review. *See J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir. 1989). Where mixed questions of law and fact are presented, the appropriate standard must be applied to each component. *In re Sharon Steel Corp.*, 871 F.2d at 1222.

relative rights of the parties pending appeal to this Court of the Bankruptcy Court's order

## III. DISCUSSION

On appeal, the Committee continues to contend that the Bankruptcy Court had jurisdiction to modify its own injunction in view of changing circumstances and shifting equities. According to the Committee, the BNY Group and Noteholders should be prevented from deriving the advantage of acquiring new rights or defenses from the refinancing of BMCA's debt while the PI Order restrains the asbestos claimants from prosecuting their claims against BMCA.

Moreover, the Committee also argues that the Bankruptcy Court retained the inherent power to modify the injunction by the terms of the PI Order itself—the PI Order provides that before the expiration of BMCA's existing credit agreements, a hearing would be held to determine whether "conditions in addition to those imposed under this Order are necessary for the continuance of the preliminary injunctive relief herein." (R. 4 at 6.)

Finally, the Committee maintains that the Bankruptcy Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b), and that this matter is ripe for judicial review.

Thus, as presented by the Committee, the two issues that are to be decided by this Court on appeal are: (1) whether the Bankruptcy Court erred in concluding that it lacked subject matter jurisdiction; and (2) whether the Bankruptcy Court erred in finding that the Committee's request to condition the refinancing on the adjudication of the Committee, Legal Representative, BNY, and Noteholders' future defenses or rights by or between each other was not ripe for judicial review.

denying the Committee's application for modification of the PI Order.

## A. *Subject Matter Jurisdiction*

As an initial matter, the Court notes that the Committee has presented the issues on appeal in such a way that subject matter jurisdiction and ripeness appear to be separate and distinct doctrines. Indeed, this is further evidenced by the statements made in the Committee's reply brief. For example, the Committee criticizes the Bankruptcy Court's June 17th decision as having mentioned ripeness in a single paragraph and seemingly regarded ripeness "simply as a different way of expressing its holding as to lack of subject-matter jurisdiction." *See* Reply Brief in Support of the Committee's Appeal ("Reply Br."), at 14. Additionally, the Committee states that the principal focus of BNY's brief is not subject matter jurisdiction, but rather, the ripeness doctrine. *Id.* The Committee's understanding of the relationship between subject matter jurisdiction and ripeness is, of course, incorrect.

■ Ripeness, while it is an independent requirement for judicial review, *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 691 (D.C.Cir.1996), is directly relevant to whether a court has subject matter jurisdiction. *See* 15 James Wm. Moore, *Moore's Federal Practice*, § 101.70[1] (3d ed.2002) (citing *Southern Pac. Transp. Co. v. Los Angeles*, 922 F.2d 498, 502 (9th Cir.1990) (ripeness is determinative of jurisdiction); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir.1995) (whether claim is ripe bears on subject matter jurisdiction)); *Thompson v. Borough of Munhall*, 44 Fed.Appx. 582, 583, 2002 WL 1840802, at *1 (3d Cir. Aug.13, 2002) ("There must be a true and ripe case or controversy for a federal court to have jurisdiction over an action"). Thus, Judge Gambardella relied on two separate and alternate grounds in determining that the Bankruptcy Court lacked subject matter jurisdiction: (1) ripeness; and (2) "related to" jurisdiction pursuant to 28 U.S.C. § 1334(b).

### 1. *Ripeness*

■ The Constitution limits the jurisdiction of the federal courts to the resolution of actual "cases" and "controversies." U.S. Const. Art. III, § 2. The "case and controversy" requirement must be satisfied in all actions, including declaratory judgment actions. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Philadelphia Fed'n of Teachers v. Ridge*, 150 F.3d 319, 322–23 (3d Cir.1998). It is this requirement that has engendered the ripeness doctrine, an aspect of justiciability, which determines when an action may be brought. *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411 & n. 12–13 (3d Cir.1992).

■ "Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so." *Renne v. Geary*, 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). The party invoking the court's jurisdiction bears the burden of demonstrating that the case is justiciable. *Id.* Because the federal courts' jurisdiction is constitutionally limited, unless the record affirmatively shows otherwise, or plaintiffs meet their burden to clearly allege facts invoking a federal court's jurisdiction, the presumption is that jurisdiction is lacking. *Philadelphia Fed'n of Teachers*, 150 F.3d at 322–23.

■ The ripeness doctrine seeks to prevent the courts "from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). "[R]uling on federal constitutional matters in advance of the necessity of deciding them [is to be avoided], to postpone judicial re-

view where it would be premature." *Armstrong*, 961 F.2d at 413, 424 (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936)).

> Ultimately, the case must involve " 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " [citations omitted]. "A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action ...' " [citations omitted].

*Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir.1994).

■ To determine whether a particular matter is ripe, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507. "The various factors that enter into a court's assessment of fitness include: whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse." *Philadelphia Fed'n of Teachers*, 150 F.3d at 323. "Where the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III." *Armstrong*, 961 F.2d at 411–12.

■ Here, the Committee seeks from the Bankruptcy Court an advance determination that BNY is precluded from asserting payment as a defense to a hypothetical future action in which the Committee seeks to retroactively void BNY's liens. The Committee insists that, contrary to the Bankruptcy Court's ruling, this controversy is ripe for judicial review pursuant to *Peachlum v. City of York, Pennsylvania*, 333 F.3d 429 (3d Cir.2003). In *Peachlum*, the Third Circuit articulated the requirements of the ripeness doctrine as follows:

> Accordingly, the ripeness doctrine requires that the challenge grow out of a "real, substantial controversy between parties" involving a "dispute definite and concrete." [citation omitted]. *The question in each case is whether the facts alleged show that there is a substantial controversy, between parties having adverse legal interests, "of sufficient immediacy and reality" to justify judicial resolution.* [citation omitted].

*Id.* at 434 (emphasis added). In this case, the controversy is not "of sufficient immediacy and reality" because the Committee's asserted "claim" is based on at least four uncertain and contingent events. As BNY argues, before the Committee can even bring an action against BNY seeking to avoid the liens given by BMCA in December 2000, the following uncertain and contingent events would first have to occur: (1) the Committee must prevail in the Successor Liability Action and establish that BMCA is liable for G–I's asbestos liabilities; (2) BMCA must file for bankruptcy relief; then (3) the Committee must succeed in getting the resultant BMCA estate substantively consolidated with the G–I estate; and finally, (4) the Committee must successfully make the substantive consolidation retroactive to the January 5, 2001 Petition Date. As BNY further points out, such speculative future "claim," which does not now exist and may never exist, does not even belong to G–I or its creditors because it relates to liens granted by BMCA rather than G–I. The Committee

does not dispute or otherwise address the fact that these contingent events would need to occur before it could file an avoidance claim against BNY, or that such events may not ever occur. Accordingly, while a court does generally have the power to modify its own preliminary injunction, the relief sought by the Committee presents a controversy too remote for judicial review.

Indeed, the Committee even concedes that "the *merits* of [BNY's] new legal defenses would not be tested until some future time, and might never be determined." Reply Br., at 15. In other words, the Committee recognizes that it is "not necessary for the Bankruptcy Court to pass upon the validity of the defenses that [BNY] might assert in the future to avoidance claims brought by representatives of G–I's bankruptcy estate." *Id.* at 16.

Rather, in an apparent effort to make the present controversy have sufficient "immediacy and reality," the Committee makes clear for the first time in its reply papers that the present dispute involves "the inequity of [BNY's] *acquisition* of [such defenses] as a result of the refinancing in the first place." Reply Br., at 16 (emphasis added). However, the Court finds that this contrived attempt to distinguish between seeking a ruling on the acquisition, as opposed to the validity, of the new legal defenses is unavailing. The Committee cannot credibly claim that BNY's mere acquisition, rather than the prospect of BNY's future use of such new legal defenses, is what it so strenuously seeks to prevent. Moreover, to the extent that the Committee argues that equitable principles should foreclose BNY from acquiring any new legal defenses, the Court cannot ignore that it would arguably be at least equally inequitable to strip BNY of such defenses without considering the validity of those defenses.

Additionally, the present dispute, even as newly characterized by the Committee as involving only BNY's mere acquisition of a new defense, is not ripe for judicial review under the very language of *Peachlum* on which the Committee relies:

The following considerations underpin the ripeness doctrine: are the parties in a sufficiently adversarial posture to be able to present their positions vigorously; are the facts of the case sufficiently developed to provide the court with enough information on which to decide the matter conclusively; and is a party genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one. [citation omitted].

*Peachlum,* 333 F.3d at 433–34. The Committee maintains that its claims are ripe under *Peachlum* because the answer to all three of these questions is "yes." Contrary to the Committee's assertions, however, the answer to at least the last of these three questions is "no." The Committee is not "genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one." BNY's acquisition or possession of a new legal defense does not presently harm the Committee; rather, any potential harm to the Committee can only occur if and when BNY actually asserts such a defense in a suit by the Committee. Additionally, as discussed *supra,* whether BNY will ever have the opportunity to assert its new legal defense against the Committee is neither imminent nor certain to occur. Thus, the Committee cannot be "genuinely aggrieved" by a matter which has not yet caused it any harm.

█ For similar reasons, the Bankruptcy Court was correct in determining that the Committee's request essentially seeks an advisory opinion. To support its contention that the Bankruptcy Court

erred, the Committee simplistically argues that its request does not "seek advice", but rather, "present and concrete modifications to an existing Preliminary Injunction," and that "[j]udicial action is not 'advisory' merely because it is taken to prevent adverse future consequences that may or may not occur." Mem. Of Law in Support of Committee's Appeal, at 35–36. While it is true that injunctive relief can reach future conduct, the Committee has cited no case that stands for the proposition that a court, by preliminary injunction or otherwise, can ignore the justiciability requirement and make a final adjudication of claims that do not exist at the time of the injunction and may never exist at all.

### 2. *28 U.S.C. § 1334(b)*

A bankruptcy court's jurisdiction extends to four types of controversies: (1) "cases under title 11", *see* 28 U.S.C. § 1334(a); (2) civil proceedings "arising under title 11"; (3) civil proceedings "arising in a case under title 11"; and (4) civil proceedings "related to a case under title 11", *see* 28 U.S.C. § 1334(b). In addition to finding that the Committee's request was not ripe for judicial review, the Bankruptcy Court also held that it lacked subject matter jurisdiction under 28 U.S.C. § 1334(b) because the Committee's request was not "related to" G–I's bankruptcy case.

On appeal, the Committee argues that not only does the Bankruptcy Court have "related to" jurisdiction pursuant to 28 U.S.C. § 1334(b), but that the Bankruptcy Court failed to consider whether it possessed subject matter jurisdiction under the "civil proceeding arising under title 11" or "arising in a case under title 11" provisions of 28 U.S.C. § 1334(b).

In response, BNY contends that the Bankruptcy Court lacked jurisdiction under each of the three grounds recognized in 28 U.S.C. § 1334(b). BNY also points out that the Committee raised before the Bankruptcy Court only the "related to" provisions of 28 U.S.C. § 1334(b), not the arguments it now asserts for the first time based upon the other provisions of 28 U.S.C. § 1334(b).

Because ripeness is an independent requirement for judicial review, and in view of this Court's ruling that this controversy is not ripe, even if the Court were to determine that subject matter exists pursuant to 28 U.S.C. § 1334(b), this controversy would still not be justiciable. Therefore, the Court need not reach the question of whether subject matter exists pursuant to any or all of the provisions of 28 U.S.C. § 1334(b).

Similarly, while the PI Order may contemplate the Bankruptcy Court's power to modify the injunction, the modification sought by the Committee, as discussed *supra,* involves a controversy too remote to satisfy the ripeness doctrine.

### B. *Estoppel*

The Committee advanced its estoppel argument as part of its position on the merits—*i.e.,* that the balance of the equities favored modifying the preliminary injunction to prevent BNY from deriving an unjust, unilateral advantage from the refinancing. Reply Br., at 18–19. Thus, in light of the Bankruptcy Court's decision that it lacked subject matter jurisdiction to decide this controversy, the Bankruptcy Court's discussion of estoppel can only be dictum. Accordingly, the Court need not rule on the estoppel issue.

### IV. *CONCLUSION*

For the reasons noted above, the Court **affirms** the Bankruptcy Court's June 18, 2003 decision that due to lack of ripeness,

it did not have subject matter jurisdiction to prejudice the rights and defenses BNY might assert in any subsequent proceedings, including actions in which the Committee or Legal Representative seek to avoid the liens granted by BMCA to secure the BNY Credit Facility.

This matter having come before the Court on the appeal of the Official Committee of Asbestos Claimants, of the United States Bankruptcy Court decision by Rosemary Gambardella, U.S.C.B.J., entered on June 18, 2003, which refused to modify a preliminary injunction for lack of subject matter jurisdiction; and

The Court having considered the submissions of the parties; and

The Court having heard oral argument on January 29, 2004; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

It is this 29th day of January, 2004, hereby ORDERED that the decision of the Bankruptcy Court is **affirmed**; and

The Clerk of the Court is ordered to **close** this appeal.